

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00694-CV

Jayme Bobette **ESTES**,
Appellant/Cross-Appellee

v.

Terry **LEIFESTE**, Individually and as Trustee of the Leifeste 2001 Descendants Trust,
Appellee/Cross-Appellant

From the 452nd District Court, Mason County, Texas
Trial Court No. 215999
Honorable Robert Rey Hofmann, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Luz Elena D. Chapa, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: August 7, 2024

AFFIRMED IN PART, REVERSED AND REMANDED IN PART

This appeal arises from a real property dispute between neighboring landowners. The dispute involves ownership of less than an acre of land ("the disputed property") in Mason County, Texas. Jayme Bobette Estes is the record title owner of the disputed property. Terry Leifeste, appearing both in his individual capacity and in his capacity as trustee of a family trust, claims he acquired the disputed property by adverse possession. Leifeste sued Estes for trespass to try title,

declaratory judgment, trespass, negligence, and wrongful fence removal. Estes moved for summary judgment on Leifeste's claims. The trial court granted Estes's motion for summary judgment thereby denying Leifeste recovery on his claims. The trial court likewise denied Estes's motion for sanctions and attorney's fees. Both Leifeste and Estes appeal. We affirm the denial of sanctions and attorney's fees and reverse the summary judgment denying Leifeste recovery on his claims.

## BACKGROUND

Leifeste[1] and Estes own adjoining tracts of land in Mason County, Texas, which are bordered on the north by the Llano River. These tracts have been owned by Leifeste's and Estes's respective families since the 1800s. Historically, a fence demarcating the boundary between the two tracts extended south-north in a straight line until it met the banks of the Llano River at a ninety-degree angle. Leifeste's predecessors in interest owned the tract to the west of the boundary fence and Estes's predecessors in interest owned the tract to the east of the boundary fence. During a major drought in the 1930s, a portion of the boundary fence—the part closest to the river—was moved downstream or eastward so that it intersected with the river at a forty-degree angle. The disputed property is the triangle of land immediately west of the modified boundary fence.

Leifeste contends that the boundary fence was modified by agreement and that Estes's predecessor in interest was compensated for it. According to Leifeste, the modified boundary fence has been the "eastern boundary line [of his tract of land] since [the 1930s] and certainly all of [his] 78 years."

In early July 2021, Estes hired a contractor to remove the modified boundary fence. On July 27, 2021, Leifeste filed suit against Estes, seeking a determination that he owns the disputed

---

[1]The Leifeste 2001 Descendants Trust also has an ownership interest in the tract.

property by adverse possession and a declaration that the modified boundary fence is the actual boundary between his tract and Estes's tract. Leifeste also alleged claims against Estes for trespass, negligence, and wrongful fence removal.[2] Estes filed an answer, denying all of Leifeste's claims and alleging she was the rightful owner of the disputed property.

**Summary Judgment Proceedings**

In her amended motion for summary judgment, Estes raised both no-evidence and traditional grounds for denying Leifeste's claims and accompanied her motion with evidence. The no-evidence grounds challenged (1) elements of Leifeste's adverse possession claim, (2) damages, and (3) the wrongful fence removal claim. The traditional grounds argued, among other things, that Leifeste's ownership of the disputed property was barred because of the statute of frauds and because of the agreement between the parties' predecessors in interest. Leifeste, in turn, filed a summary judgment response accompanied by evidence. Leifeste also moved to strike some of the evidence Estes submitted in support of her summary judgment motion.

After a hearing, the trial court granted Estes's summary judgment motion denying all of Leifeste's claims. The trial court's order did not specify the grounds on which its summary judgment ruling was based.

**Motion for Sanctions and Attorney's Fees**

Estes filed an amended motion for sanctions and attorney's fees, arguing the trial court's summary judgment ruling disposing of Leifeste's claims established that his claims were groundless and brought in bad faith. Estes argued she was entitled to attorney's fees under both section 16.034 and chapter 10 of the civil practice and remedies code. Estes attached evidence to

---

[2]By statute, the removal of a separating fence without proper notice or consent may form the basis of an action for damages. *See* TEX. AGRIC. CODE §§ 143.121-123.

her motion, which consisted of an affidavit from her counsel and counsel's billing records. In opposing the motion for sanctions and attorney's fees, Leifeste moved to strike Estes's evidence, alleging she failed to comply with the discovery rules.

The trial court held a bench trial on the remaining issues in the case, including Estes's motion for sanctions and attorney's fees. The trial court granted Leifeste's motion to strike Estes's evidence and denied Estes's motion for sanctions and attorney's fees.

After the trial court signed a final judgment incorporating its rulings, Estes timely filed a notice of appeal, and Leifeste timely filed a notice of cross-appeal.

SUMMARY JUDGMENT PROCEEDINGS

We begin our analysis by addressing an evidentiary ruling related to the summary judgment.

**Evidentiary Ruling**

In his second issue, Leifeste argues the trial court abused its discretion by denying his motion to strike[3] two affidavits from Estes's counsel, Rick B. Yeager. In his motion to strike, Leifeste argued that two of Yeager's affidavits—Exhibit "D" and Exhibit "G"—should be excluded based on rule 3.08(a) of the Texas Rules of Disciplinary Procedure.

1. Applicable Law

We review a trial court's evidentiary rulings related to a summary judgment for an abuse of discretion. *Starwood Mgmt., LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017). A trial court abuses its discretion when it acts without reference to any guiding rules and principles. *Id*. (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)).

---

[3]Alternatively, Leifeste's motion asked the trial court to disqualify Estes's lawyer. On appeal, Leifeste does not challenge the trial court's denial of his request for disqualification of Estes's lawyer.

Rule 3.08(a) prohibits an attorney from appearing both as a witness and as counsel in the same matter, subject to a few exceptions. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.08, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9). Rule 3.08(a) provides:

> A lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client, unless:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony;
>
> (3) the testimony relates to the nature and value of legal services rendered in the case;
>
> (4) the lawyer is a party to the action and is appearing pro se; or
>
> (5) the lawyer has promptly notified opposing counsel that the lawyer expects to testify in the matter and disqualification of the lawyer would work substantial hardship on the client.

*Id*.

The comments to rule 3.08 state that if "the lawyer's testimony concerns a controversial or contested matter, combining the roles of advocate and witness can unfairly prejudice the opposing party." *Id*. cmt. 4. "[T]he appearance of a testifying advocate tends to cast doubt on the ethics and propriety of the judicial system." *Aghili v. Banks*, 63 S.W.3d 812, 818 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Thus, unless one of rule 3.08(a)'s exceptions applies, a lawyer who represents a client as an advocate before a court is considered "incompetent" to provide evidence in that matter. *Id*. at 819. "When an attorney who represents a party is an affiant in support of a motion for summary judgment, he or she is a witness." *Id*. at 817-18; s*ee Mauze v. Curry*, 861

S.W.2d 869, 870 (Tex. 1993) (concluding counsel improperly testified as an expert witness in violation of rule 3.08 when, to defeat a summary judgment, he signed an affidavit opining that the defendant lawyer in a malpractice case was negligent and caused damages).

2.  Analysis

In his first affidavit, which is dated August 9, 2021, and labeled Exhibit "D," Yeager testified that he is a "Registered Professional Engineer (inactive), licensed real estate broker, patent attorney, and rancher." He claimed that he had reviewed aerial photographs of the boundary fence and disputed area from various years between 1955 and 2016 as well as satellite images showing heavy brush and vegetation in the disputed area. He further claimed that he had inspected the disputed area and opined that he "would have agreed to deviating a boundary [] to [the] terminal post without compensation, and without transfer of ownership because it would permit a more robust fence that required less maintenance." Yeager also testified, "Like most of its neighbors, the area between Leifeste's river portion fence and river shows little evidence of continuous or frequent cattle grazing. Specifically, I did not observe [] cattle in that area; and there was no discernible cattle trails or vehicle road through the gate."

The use of the disputed property for grazing and the visibility of the modified boundary fence were potentially important to Leifeste's adverse possession claim. As Estes's counsel, Yeager was an inappropriate person to testify about these facts. Plus, none of rule 3.08(a)'s exceptions apply. Accordingly, the trial court abused its discretion by denying Leifeste's motion to strike Exhibit "D." *See Southtex 66 Pipeline Co. v. Spoor*, 238 S.W.3d 538, 543-44 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (holding parties' counsel was "an inappropriate person to present any facts" regarding the ultimate issue in the case and, thus, trial court abused its discretion by admitting counsel's affidavit); *Reliance Capital, Inc. v. G.R. Hmaidan, Inc.*, No. 14-05-00061-

CV, 2006 WL 1389539, at *4 (Tex. App.—Houston [14th Dist.] May 18, 2006, no pet.) (holding trial court abused its discretion by admitting affidavit in which party's counsel testified about an ultimate issue in the case). Because the trial court should have excluded Exhibit "D," we do not consider it in our analysis.

In his second affidavit, which is dated November 29, 2021, and labeled Exhibit "G," Yeager testified about the number of hours he spent working on this case, the "high" market value of the disputed property, the reason for the contingent fee structure, and the legal costs associated with defending this legal action. Thus, the testimony Yeager provided in Exhibit "G'" relates to uncontested issues and the nature and value of legal services rendered in the case. The trial court could have reasonably determined that some of the exceptions enumerated in rule 3.08(a) applied to the testimony contained in Exhibit "G." Accordingly, the trial court did not abuse its discretion by denying Leifeste's motion to strike Exhibit "G."

**Summary Judgment Standards**

"After adequate time for discovery, a party . . . . may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim . . . on which the adverse party would have the burden of proof at trial." TEX. R. CIV. P. 166a(i). "The motion must state the elements as to which there is no evidence." *Id*. To defeat a no-evidence motion for summary judgment, "the respondent is not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements." *Id*. cmt. 1997. We affirm a no-evidence summary judgment only if the respondent failed to produce more than a scintilla of probative evidence raising a genuine issue of material fact on a challenged element of the cause of action. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

"The standard of review for a traditional motion for summary judgment is whether the successful movant at the trial level carried [her] burden of showing that there is no genuine issue of material fact and that judgment should be granted as a matter of law." *Bell v. Petsch*, No. 04-22-00371-CV, 2023 WL 5603195, at *2 (Tex. App.—San Antonio Aug. 30, 2023, pet. filed) (citation omitted); *see* TEX. R. CIV. P. 166a(c). Thus, to be entitled to a traditional summary judgment, Estes, as the defendant, had to either conclusively negate at least one of the essential elements of each of Leifeste's claims, or conclusively establish all elements of an affirmative defense. *See Bell*, 2023 WL 5603195, at *2. "Evidence is conclusive only if reasonable people could not differ in their conclusions." *Id*. (citation omitted). We affirm a traditional summary judgment only if the movant established there are no genuine issues of material fact, and she is entitled to judgment as a matter of law on a ground expressly set forth in the motion. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004).

We review both traditional and no-evidence summary judgments de novo. *Id*. When reviewing both no-evidence and traditional summary judgments, we consider the evidence in the light most favorable to the respondent and indulge all reasonable inferences and resolve any doubts in his favor. *Id*. at 157.

**Adverse Possession**

In his first issue, Leifeste argues the trial court erred by granting summary judgment on his adverse possession claim because genuine issues of material fact existed as to the elements of adverse possession. He further argues that neither the statute of frauds nor the agreement between the parties' predecessors in interest precludes his adverse possession claim.

1. Applicable Law

"The doctrine of adverse possession is based on statutes of limitation for the recovery of real property." *Wells v. Johnson*, 443 S.W.3d 479, 488 (Tex. App.—Amarillo 2014, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE §§ 16.021–.037). "[I]n the context of a dispute concerning possession of real property, the rightful owner of the property must institute suit within a specified period of time (three, five, ten or twenty-five years depending on various statutory factors and conditions) or subsequently be barred from recovery." *Id*.

After the specified time period elapses, "[n]ot only are suits for the recovery of possession by the rightful owner barred, adverse possession provisions also operate to vest the adverse claimant with title to the property." *Id*. "If an action for the recovery of real property is barred under [Chapter 16 of the Texas Civil Practice and Remedies Code], the person who holds the property in peaceable and adverse possession has full title, precluding all claims." TEX. CIV. PRAC. & REM. CODE § 16.030(a). The ten-year and twenty-five-year statutes of limitation, which are relevant to the present case, provide: "[a] person must bring suit not later than" either 10 years or 25 years "after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who cultivates, uses or enjoys the property." *Id*. §§ 16.026, 16.027.

Adverse possession requires "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 69 (Tex. 2011) (quoting TEX. CIV. PRAC. & REM. CODE § 16.021(1)). Thus, to prevail on a claim of adverse possession, a claimant must establish (1) the actual and visible possession of the disputed property; (2) that is adverse and hostile to the claim of the owner of record title; (3) that is open and notorious; (4) that is peaceable; (5) that is exclusive; and (6) that involves continuous cultivation, use, or enjoyment

throughout the statutory period. *Bell*, 2023 WL 5603195, at *2; *see also Villarreal v. Guerra*, 446 S.W.3d 404, 410 (Tex. App.—San Antonio 2014, pet. denied).

"The possession must be of such character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant." *Marshall*, 342 S.W.3d at 70 (citation omitted). "The test for hostility is whether acts performed by the claimant on the land, and the use made of the land, were of such a nature and character as to reasonably notify the true owner of the land that a hostile claim was being made to the property." *Villarreal v. Chesapeake Zapata, L.P.*, No. 04-08-00171-CV, 2009 WL 1956387, at *3 (Tex. App.—San Antonio July 8, 2009, no pet.). Open and notorious possession carries with it an indicium of ownership and, in that sense, operates as notice to the true owner that title to his property is being claimed by the party who is openly using or profiting from the disputed property. *Felts v. Whitaker*, 129 S.W.2d 682, 687-88 (Tex. App.—Fort Worth 1939), *aff'd*, 155 S.W.2d 604 (Tex. [Comm'n Op.] 1941). In that regard, the nature of the possession must be so obvious as to afford grounds for a presumption of knowledge or notice, and it must be sufficiently "open, exclusive and visible" as to excite an inquiry, for the term of the limitations period. *Id*. at 688.

"[W]here lands have been designedly enclosed and used continuously for grazing purposes for the statutory period, such is sufficient notice of hostile claim to support a claim of adverse possession." *Mixon v. Clark*, 518 S.W.2d 402, 406 (Tex. App.—Tyler 1974, writ ref'd n.r.e.). However, "a casual or incidental enclosure" combined with "occasional or casual grazing" within the enclosure will not support a claim of adverse possession. *Id*. "In determining whether the fence is or is not a casual fence, [courts] must look to the whole fencing pattern and the use made of the fence, as well as all the other facts and circumstances." *Id*.

Generally, adverse possession is a question of fact. *Rhodes v. Cahill*, 802 S.W.2d 643, 646 (Tex. 1990). At trial, a party seeking to establish title to land by virtue of adverse possession has the burden of proving every fact essential to that claim by a preponderance of the evidence. *Id*. at 645.

### 2. Summary Judgment Evidence

With respect to adverse possession, Estes's no-evidence motion asserted there was no evidence of: (1) actual and visible possession, (2) adverse and hostile possession, (3) open and notorious possession, and (4) continuous cultivation, use, or enjoyment for the required statutory period.

Jayme Bobette Estes's Affidavit and Deposition Testimony

The summary judgment evidence included both affidavit and deposition testimony from Jayme Bobette Estes. In her affidavit, Estes, who was sixty years old and had inherited her tract, testified that she roamed the property as a child. Estes did not recall any cattle being present on the disputed property, which was hard to access because of heavy brush; nor did she recall animals accessing the river from the disputed property. Estes further testified that she began living on her tract full time in April 2017.

Estes acknowledged that Leifeste had discussed the disputed property with her. Sometime in 2017 or 2018, Leifeste informed Estes that they "needed to fix the paperwork/deed on [their] fence line so that [their] kids would not have to deal with it when [they] were gone." Leifeste "explained that [his predecessor in interest] had been given access to the river to water animals and that [was] why the fence line between [their tracts] was not straight [but] angled into [her] property." Leifeste also told her that "back in the 1930s" her grandfather had agreed to give his grandfather "access" to the disputed property, and her grandfather had been "compensated for the

original river frontage." But, according to Estes, no one in her family had told her about this arrangement, "even though [] Leifeste insist[ed] he had [had] conversations with [her] aunt (Mildred Hall) regarding the fixing of the paperwork/deeds."

Estes also testified that a huge flood downed fences and left debris on her land in 2018. Estes stated that after the 2018 flood the modified boundary fence was "completely in the dirt" and "not visible in some areas." She did not recall seeing any purple fence posts before the 2018 flood.

In her deposition testimony, Estes testified that she owned and operated a public campground on her tract, which was "at least" fifty to seventy-five yards from the disputed property. She further testified that the modified boundary fence had been there for her entire life, that she had never crossed it, that she had never used the land on the other side of the modified boundary fence, and that she had never told her campers that they could cross that boundary fence. Contrary to her affidavit, Estes testified that purple painted fence posts were in fact along the disputed boundary fence.

Pat Estes's Affidavit

Estes's husband, Pat Estes, testified by affidavit that he and his wife had moved to their Mason County land full time in 2017. Prior to that, they had visited the land numerous times each year since 2001. After Leifeste approached him and his wife about the fence line and "fixing the paperwork," he went to the disputed area and observed the fence in question. He described the disputed property as "heavily wooded, and hard to get to" and he "did not notice any fence posts painted purple." This was the first time he and Estes "knew the fence line was not straight." He further testified that "[a]fter the October 2018 flood, [they] had a lot of damage and debris in the

wooded area in question" and the "fence line along the disputed area was flat to the ground and covered in debris."

Donnie Hopson's Affidavit

In his affidavit, Donnie Hopson testified that he was the owner of a construction company that provides land improvements. Estes hired him to clear brush and debris near the river on the western portion of her property. Upon commencing the work, he noticed "a diagonal fence was down and covered in dirt and flood debris." Hopson surmised that "the fence had been down since at least a major flood in October 2018." While doing his work, Hopson cleared around a large cedar post located on higher ground near the river, but he did not see any purple paint on that post. He acknowledged that "[s]ome landowners use purple paint to provide no trespassing notice." He added that he "salvaged numerous metal t-posts from the downed diagonal fence and stacked them against a tree" and he "did not notice any purple paint on those posts or on trees."

Frank Falk's Deposition Testimony[4]

In his deposition, Frank Falk testified that he was familiar with the modified boundary fence and the disputed property. According to Falk, he leased Estes's tract for hunting in 1961 or 1962. Thereafter, from 1986 to the present, Falk lived in a mobile home on Estes's tract. Falk, who used to work at the campground on Estes's tract, told the campers that they could not cross the boundary fence between the properties. According to Falk, the boundary fence had been "at that angle" since he first visited Estes's land in 1961, "except for after the flood, when the flood took it out." He also testified that the part of the fence near the river "was down" following "a big flood

---

[4]The summary judgment evidence also includes an affidavit from Falk, which generally mirrors his deposition testimony.

in 2000," but he was not sure if it had been rebuilt. Falk admitted that he "might have seen" one "no trespassing" sign on the boundary fence.

Falk also testified that Estes's aunt and predecessor in interest, Mildred Hall, had told him that the fence was moved and "put on that angle" so that Leifeste's predecessors in interest could "water [their] hogs" at the river. Falk also recalled that Leifeste had talked to Hall about the disputed property and he "knew personally [that Hall] was not for it." He remembered Hall saying, "You want my land …. Grandpa did you a favor by letting his cousin water his hogs and now you want my land."

Terry Leifeste's Affidavits

In his initial affidavit, Terry Leifeste testified that he and a trust he had created for the benefit of his family, owned a ranch in Mason County near Castell, Texas. The ranch had been in his family for "multiple generations" "since the middle of the 19th century." During the major drought of the 1930s, Leifeste's grandfather modified the boundary fence line between the two tracts of land, extending it downstream to the riverbank where it terminated at a fence post at the river's edge. The modification of the boundary fence line allowed cattle from both tracts to have access to water at the Llano River, and it minimized the potential mixing of cattle from each side. Leifeste characterized the fence line modification, which took place more than 80 years ago, as "[a]n accommodation for the mutual benefit of both families." Leifeste contended that his grandfather had "compensated" Estes's predecessor in title "for the land that was obtained by the new boundary fence location" and [t]hat fence has been [his family's] eastern boundary line since that time and certainly all of [his] 78 years." Leifeste further testified that his family has "had exclusive use, control, and possession of all the property on the west side of the boundary fence for over 80 years and for all of [his] 78 years," adding "[w]e have cultivated, used, and enjoyed

the property west of the boundary fence exclusively for more than 25 years excluding all others except invited guests." Leifeste also testified that his family has "always had 'No Trespassing' signs on the boundary fence with the now-Estes property" and "[w]hen the purple paint legislation[5] came out several years ago, we painted purple on the fence posts to further signify that entry onto our property was forbidden."

In his supplemental affidavit, Leifeste testified: "The location of the designated boundary fence was selected to allow the use of the terrain to enclose livestock. The terminal post on the high bluff at the river and the slough on our side of the designated boundary fence made it very difficult, if not impossible, for livestock to get around to [Estes's property]." Leifeste also testified: "Our property was fenced on three sides with the Llano River on the fourth side operating as both a natural barrier and the source of water and forage for the livestock….[The] purpose of [the designated boundary fence] was to enclose the livestock on our property using the natural terrain of the high bluff and the slough to enclose our livestock." Additionally, Leifeste testified that his family "had both cattle and hogs. The slough in that area is where the livestock watered." He went on to testify that during the 1950s drought, "[t]here was no water in most of Mason County. Before and after the 1952 flood we continued using the Llano River to water and graze our livestock. That is the only grass we had due to the drought. The fence, if it was damaged then, was repaired so we could keep our livestock enclosed." Leifeste added: "We have repaired, maintained, and replaced the designated boundary fence ourselves all my lifetime. It has been substantially modified from what was there in the 1930s." Finally, Leifeste testified that he did not recall exactly when his

---

[5]Under Texas's criminal trespass statute, the owner of property may notify others that entry onto his property is a trespass through (1) oral or written communication, (2) fencing, (3) posting of signs, or (4) prominently painting purple paint marks on trees or posts located on the property and readily visible to any person approaching the property. *See* TEX. PENAL CODE § 30.05(b)(2).

family first posted "no trespassing" signs on the property, but he knew that the signs had been there "since at least the 1980s."

Alan Leifeste's Affidavits

In his affidavit, Leifeste's son, Alan, testified that he was "very familiar" with the location of the existing boundary fences on the property in Mason County, Texas. Alan further testified that his family had "always had 'No Trespassing' signs on the boundary fence with the now-Estes property" and when "the purple paint legislation" passed, his family "painted purple on the fence posts to further signify that entry on our property was forbidden." According to Alan, for the "many decades" that Estes's predecessor in interest was the owner of the property, they had "never had a problem with the boundary line or the fence." Finally, Alan testified that his family had "had exclusive use, control, and possession of all property on th[e] west side of the boundary fence for over 80 years and for all of [his] 48 years," and they "ha[d] cultivated, used and enjoyed the property west of the boundary fence exclusively for more than 25 years, specifically excluding Bobette and Pat Estes and any of their guests and invitees."

In his supplemental affidavit, Alan testified: "During my lifetime the designated boundary fence has been in the same location until [Estes] dozed it down in July, 2021. There has never been a period of time in my lifetime where 95% of the designated boundary fence was down. Prior to the 2018 flood, there was never a time when the fence was not clearly a standing boundary fence strung with four barb-wire wires . . ." and "[e]ven after the 2018 flood, the entire fence was not down." Alan further testified that "during his lifetime," his family had had "the exclusive use and possession of the [disputed property]," which they had "used [] for recreation, including hunting, fishing, camping, swimming, kayaking and canoeing, and reunions." He further testified his family had "mowed and trimmed the trees in the area in question" and "repaired and replaced portions of

the boundary fence if it was damaged by flood waters." Alan finally testified that "[t]he designated boundary fence has been substantially modified and replaced through the years" and his family had "restrung all of the barbed wire at one time or another."

Anne Rowland's Affidavit

In her affidavit, Anne Rowland testified that she had known Leifeste since 1997, and she had visited his ranch in Mason County, Texas, many times through the years. Rowland was familiar with the location of the boundary fence between the Leifeste property and the Estes property. Rowland testified that she had used the disputed property with Leifeste and his family and friends "on quite a few occasions over the past 20 years or more." She further testified that in 2001 or 2002 she helped Leifeste paint the fence posts and t-posts of the boundary fence with purple paint. The purpose of doing so was to give notice that it was Leifeste's private property. Additionally, the designated fence also had "private property-no trespassing" signs on it.

Robin Matthews's Affidavit

In his affidavit, Robin Matthews testified that he "was familiar with the location of the boundary fence north of the Leifeste river pasture gate that angles off to the end of the bluff at the south bank of the Llano River and serves as the boundary between the Leifeste property and the neighboring property to the east." Matthews testified that he had been on Leifeste's Mason County property "countless" times through the years beginning in 1957." According to Matthews, the boundary fence had always been in the same location, and he had never seen it "laid over, covered with debris, or down in the dirt." To the contrary, "[e]ach time he had been there, the boundary fence was standing and in good condition." Matthews was aware of "no trespassing" and "posted" signs on the fence, and after "the purple paint law came into effect," he "saw the posts along the fence painted purple." Additionally, Matthews had never seen anyone from the neighboring

property in this area. As to activities, Matthews stated that he had "fished in the slough that was right at that location," and he had "swam, canoed, kayaked at that location" with Leifeste's son, Alan, "multiple times." And, "[b]eginning in 1961, [they had held] class reunions there every year." "The Leifestes used this area for their use and enjoyment exclusively. Only their friends and guests were allowed." Additionally, Matthews testified he had "had campfires in the fire pit that was there," and had "camped there at that location several times through the years." He added that "[t]he Leifestes kept the trees trimmed and the grass mowed." Finally, Matthews testified that "[a]t no time between the 1980s to the present did [he] see the fence without the 'No trespassing' sign," nor did he "ever see[] anyone from the neighboring property cross the boundary fence or enter upon the Leifeste's property in this area."

Photographs and Documents

Both sides presented photographs of the disputed property and other documents to support their positions; however, these photographs and documents do not provide conclusive evidence concerning any of the issues before us.

3. Analysis—No-Evidence Motion

As to actual, visible appropriation and adverse, hostile possession of the disputed property, there was evidence that the modified boundary fence had been in place for eighty years and that Leifeste and his son, Alan, had maintained the modified boundary fence and rebuilt it. There was also evidence that "No Trespassing" signs had been placed on the modified boundary fence and that Leifeste had painted its posts purple in 2001 or 2002. As even Estes admitted in her deposition testimony, the modified boundary fence included "purple painted fence posts." Both Estes and Falk acknowledged in their deposition testimony that neither Estes nor her campground guests ever crossed the boundary fence to enter the disputed property, and Falk expressly told

campground guests they could not cross the boundary fence. Additionally, the evidence showed that Leifeste, his family, and his guests used the disputed property for recreation and gatherings to the exclusion of all others. Considering the summary judgment evidence in the light most favorable to Leifeste and indulging all reasonable inferences and resolving any doubts in his favor, we conclude that a genuine issue of material fact exists as to the actual, visible appropriation and adverse, hostile possession elements of Leifeste's adverse possession claim.

As to the open and notorious possession of the disputed property, evidence of purple fence posts and "No Trespassing" signs support this element, too. Although Estes testified that the modified boundary fence was "completely in the dirt" and "not visible in some areas" after the 2018 flood, this testimony was disputed. Alan testified that parts of the modified boundary fence remained intact after the 2018 flood. Putting this disputed fact aside, there was other evidence from which a factfinder could determine that Leifeste's adverse possession claim matured before the 2018 flood. In addition to these open and notorious acts of possession, there was evidence of verbal assertions of ownership, which may also satisfy this element. *See Orsborn v. Deep Rock Oil Corp.*, 267 S.W.2d 781, 787 (Tex. 1954) (providing that an adverse possession claimant's claim of right "must be manifested by declaration or open and visible act" and explaining that if "there is no verbal assertion of claim to the land brought to the knowledge of the landowner, the adverse possession must be so open and notorious and manifested by such open or visible act or acts that knowledge on the part of the owner will be presumed"). Specifically, Leifeste had declared to both Estes and her predecessor in interest, Hall, that he owned the disputed property, and he had asked both of them to cooperate with him in "fixing" the record title. Considering the evidence in the light most favorable to Leifeste and indulging all reasonable inferences and resolving any doubts

in his favor, we conclude that a genuine issue of material fact exists with respect to the open and notorious element of Leifeste's adverse possession claim.

As to continuous cultivation, use, and enjoyment of the disputed property for the required statutory period, there was evidence presented Leifeste and his family engaged in various recreational pursuits on the disputed property, including hunting, camping, fishing, kayaking, canoeing, and family reunions, over the course of many years. "[A] party seeking to adversely possess land only needs to use or enjoy the land in a manner to which the land is adaptable and as an ordinary user would use the property." *Reid Estates Civic Club v. Boyer, Inc.*, No. 01-09-00282-CV, 2011 WL 6938513, at \*11 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (holding there was some evidence from which jury could find use and enjoyment element of adverse possession where there was evidence that family used river banks for picnics and fishing, which were recreational uses to which the property was adaptable). In the present case, the evidence showed that the neighboring tract owned by Estes had a remarkably similar usage. Estes herself testified that her campground, located approximately fifty to seventy-five yards from the disputed property, was used for camping, fishing, and kayaking. *See id*. at \*11 n.10 ("[R]ecreational activities can be sufficient to establish hostile use with respect to land that both parties concede is only suitable for recreational pursuits."). Considering the evidence in the light most favorable to Leifeste and indulging all reasonable inferences and resolving any doubts in his favor, we conclude that a genuine issue of material fact exists as to the continuous cultivation, use, and enjoyment element of Leifeste's adverse possession claim.

To the extent Estes argued in her summary judgment motion that Leifeste was precluded from recovering on his adverse possession claim because the disputed property was not "designedly enclosed" and because grazing was not continuous, she is mistaken. "The adverse

claimant who relies upon grazing *only* as evidence of his adverse use and enjoyment must show as part of his case that the land in dispute was designedly enclosed." *Roberts v. Ratliff*, No. 02-18-00125-CV, 2018 WL 3763931, at \*4 (Tex. App.—Fort Worth Aug. 9, 2018, no pet.) (quoting *McDonald v. Weinacht*, 465 S.W.2d 136, 141-42 (Tex. 1971) (emphasis added)*; Trevino v. Trevino*, 64 S.W.3d 166, 172 (Tex. App.—San Antonio 2001, no pet.) ("An exception to the enclosure requirement exists if the claimant can prove sufficient non-grazing use of the land such that the true owner would have notice of the hostile claim."). Leifeste is not relying upon grazing alone to establish his adverse use and enjoyment of the disputed property. As discussed above, Leifeste produced evidence of various recreational uses and enjoyment of the disputed property, including hunting, camping, fishing, kayaking, canoeing, and family reunions. Accordingly, proof of a designed enclosure and continuous grazing was not essential to Leifeste's adverse possession claim.[6] *See, e.g., Fish v. Bannister*, 759 S.W.2d 714, 720 (Tex. App.—San Antonio 1988, no writ) ("Since there is evidence of uses other than grazing, the 'grazing only' exception does not apply, thereby eliminating the need for proof of a designed enclosure.").

We hold the summary judgment evidence shows that material fact issues exist as to (1) actual and visible possession, (2) adverse and hostile possession, (3) open and notorious possession, and (4) continuous cultivation, use, or enjoyment for the required statutory period. Therefore, the trial court erred in granting Estes's no-evidence summary judgment motion.

4. Analysis—Traditional Motion

In her traditional summary judgment motion, Estes argued she was entitled to summary judgment because: (1) the disputed property was not "designedly enclosed" and grazing was not

---

[6]We express no opinion about whether the summary judgment evidence might satisfy a "designed enclosure/grazing" theory of adverse possession, which is a determination that must be made at trial by the factfinder.

continuous; (2) the painted posts could not provide an unmistakable assertion of ownership; (3) "a single portion of boundary fence" could not establish adverse possession; (4) occasional recreational use or hunting was insufficient to establish adverse possession; and (5) the adverse possession claim was "interrupted" by long periods when the fence was down or the purple paint was faded and not visible. To be entitled to a traditional summary judgment, Estes, as the defendant, had to either conclusively negate at least one of the essential elements of Leifeste's adverse possession claim, or conclusively establish all elements of an affirmative defense. *See Bell*, 2023 WL 5603195, at *2. In light of the summary judgment evidence and the applicable law, we conclude that Estes failed to conclusively negate at least one essential element of Leifeste's adverse possession claim, or conclusively establish all elements of an affirmative defense with respect to any of the aforementioned traditional summary judgment grounds.

Likewise, we conclude that Estes was not entitled to judgment as a matter of law on her two remaining traditional grounds. First, Estes argued that "[u]nder the statute of frauds, the alleged compensation cannot support a voluntary transfer." *See Joslin v. Munoz*, No. 07-23-00284-CV, 2024 WL 1895177, at *2 (Tex. App.—Amarillo Apr. 30, 2024, no pet. h.) (recognizing the general rule that a conveyance of real property must be in writing, but that an exception exists for an oral gift of real estate); *see also* TEX. PROP. CODE § 5.021 (requiring instrument of conveyance); TEX. BUS. & COM. CODE § 26.01(a), (b)(4) (Statute of Frauds). Here, however, Leifeste bases his ownership claim on adverse possession rather than a voluntary transfer. Accordingly, the statute of frauds is not a ground for barring Leifeste's ownership claim, and the summary judgment cannot be upheld on this ground.

Second, Estes argued summary judgment should be granted because "an adverse possession claim cannot commence or continue when there is an agreement between the parties."

Estes's argument focuses on the agreement between the parties' predecessors in interest allowing Leifeste's predecessor in interest to use the disputed property. "Possession of land by adverse claimants who began their entry upon the disputed land with the permission of the record owner cannot establish adverse possession unless and until they give notice of the hostile nature of their possession." *Chesapeake Zapata*, 2009 WL 1956387, at *3 (quoting *Wright v. Wallace*, 700 S.W.2d 269, 271 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.)). "A person permissively occupying property must repudiate the permissive occupancy by a visible and unequivocal act of adversity in order to begin the running of the periods required for adverse possession to secure title in the adverse possessor." *Capps v. Gibbs*, No. 10-12-00294-CV, 2013 WL 1701772, at *6 (Tex. App.—Waco Apr. 18, 2013, pet. denied) (citing *McLaren v. Beard*, 811 S.W.2d 564, 569 (Tex. 1991)). But actual notice of the adverse claimant's repudiation of permissive possession is not required, and "[u]nder certain circumstances, notice may be inferred." *Tex-Wis Co. v. Johnson*, 534 S.W.2d 895, 899 (Tex. 1976). As explained by the Texas Supreme Court:

> It is not necessary, however, that actual notice of an adverse holding and disseizin be given to a cotenant or owner. Such notice may be constructive and will be presumed to have been brought home to the co-tenant or owner when the adverse occupancy and claim of title to the property is so long-continued, open, notorious, exclusive and inconsistent with the existence of title in others, except the occupant, that the law will raise the inference of notice to the co-tenant or owner out of possession, or from which a jury might rightfully presume such notice.

*Vasquez v. Meaders*, 291 S.W.2d 926, 928-29 (Tex. 1956) (citation omitted); *see also Tex.-Wis Co.*, 534 S.W.2d at 899.

"In summary judgment, reasonable inferences must be indulged in favor of the non-movant; the movant is not entitled to inferences, but must prove entitlement to judgment as a matter of law." *Hardaway v. Nixon*, 544 S.W.3d 402, 410 (Tex. App.—San Antonio 2017, pet. denied). Viewing the summary judgment evidence in the light most favorable to Leifeste and indulging all

inferences in his favor, we conclude the summary judgment evidence raises a genuine issue of material fact as to whether Leifeste and his predecessors in interest gave Estes and her predecessors in interest notice of their repudiation of the agreement. *See Capps*, No. 10-2013 WL 1701772, at *7 ("Assuming that Capps is correct that Gibbs still owed money under the agreement, a reasonable finder of fact could have concluded that Gibbs's refusal to make additional payments in March 2006 constituted a repudiation of the agreement and alerted Capps that Gibbs's continued possession of the property under color of title was hostile in nature."); *Fish v. Hodges*, No. 03-10-00532-CV, 2012 WL 2979078, at *3 (Tex. App.—Austin July 12, 2012, pet. denied) (concluding "the jury could have reasonably inferred that [adverse claimant] repudiated the holdover tenancy and claimed the disputed land for herself during the first fourteen years after 1983," based on evidence showing that, over a twenty-four-year period, the adverse claimant built and maintained fences around the land, placed locks on gates, granted permission for entry on the land, and leased the land for grazing and hunting, and the record title owner, over the same period, never asserted any claim to the disputed land).

In sum, Estes did not conclusively establish that she was entitled to judgment as a matter of law because of the statute of frauds or the agreement between the parties' predecessors in interest. Accordingly, we hold the trial court erred by granting traditional summary judgment on Leifeste's claims based on adverse possession.

**Trespass, Negligence, and Fence Removal Claims**

In his third issue, Leifeste argues the trial court erred in granting summary judgment on his trespass and negligence claims because Estes's summary judgment motion did not address those claims. "A motion for summary judgment must itself expressly present the grounds on which it is made, and must stand or fall on these grounds alone." *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d

910, 912 (Tex. 1997) (citing *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993)). Nowhere in her summary judgment motion did Estes mention Leifeste's trespass and negligence claims. Accordingly, we hold the trial court erred in granting summary judgment on these claims. *See id.*

In his third issue, Leifeste also argues that the trial court erred in granting summary judgment on his fence removal claim.[7] As to Leifeste's fence removal claim, Estes moved for no-evidence summary judgment arguing "[t]here is no evidence to refute witness affidavits that the fence was down after the 2018 flood, and never repaired or replaced." However, in his second affidavit, Alan testified that "[e]ven after the 2018 flood, the entire fence was not down." Because Leifeste produced evidence on the challenged element, the trial court erred in granting summary judgment on his fence removal claim.

## MOTION FOR SANCTIONS AND ATTORNEY'S FEES

In her second issue, Estes argues the trial court erred by not finding that Leifeste's adverse possession claim was groundless and brought in bad faith and by not awarding her attorney's fees under section 16.034(a)(1) of the civil practice and remedies code. In her third issue, Estes argues the record contains sufficient evidence to award her reasonable attorney's fees under section 16.034(a)(2) of the civil practice and remedies code. We address these issues together.

---

[7] Section 143.121, titled "Prohibition," states:

> Except as provided by this subchapter or by mutual consent of the parties, a person may not remove a fence that is:
>
> > (1) a separating or dividing fence in which the person is a joint owner; or
> > (2) attached to a fence owned or controlled by another person.

TEX. AGRIC. CODE § 143.121.

**Relevant Background**

In her amended motion for sanctions, Estes argued that Leifeste's adverse possession claim was groundless and brought in bad faith. The amended motion asked the trial court to award Estes attorney's fees under section 16.034(a) of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE § 16.034(a) (authorizing award of costs and reasonable attorney's fees in certain suits for possession of real property). In support of her request for attorney's fees, Estes attached counsel's affidavit on attorney's fees and corresponding billing records. However, Leifeste moved to exclude any expert testimony from Estes's counsel and the documents attached to the sanctions motion, alleging Estes had failed to comply with the discovery rules. The trial court granted Leifeste's motion to exclude Estes's evidence of attorney's fees and denied her amended motion for sanctions and attorney's fees.

**Analysis**

Section 16.034(a) of the civil practice and remedies code provides:

(a) In a suit for the possession of real property between a person claiming under record title to the property and one claiming by adverse possession, *if the prevailing party recovers possession of the property* from a person unlawfully in actual possession, the court:

> (1) shall award costs and reasonable attorney's fees to the prevailing party if the court finds that the person unlawfully in actual possession made a claim of adverse possession that was groundless and made in bad faith; and

> (2)  may award costs and reasonable attorney's fees to the prevailing party in the absence of a finding described by Subdivision (1).

TEX. CIV. PRAC. & REM. CODE § 16.034(a) (emphasis added). Thus, under section 16.034(a)(1), the prevailing party in certain types of suits for the possession of real property is entitled to attorney's fees upon a showing that the suit is both groundless and made in bad faith. *See id*. § 16.034(a)(1); *NAC Tex Hotel Co. v. Greak*, 481 S.W.3d 327, 335 (Tex. App.—Tyler 2015, no

pet.). However, under section 16.034(a)(2), the trial court has the discretion to award attorney's fees to the prevailing party even in the absence of a bad faith finding.[8] *See* TEX. CIV. PRAC. & REM. CODE § 16.034(a)(2); *Greak*, 481 S.W.3d at 335.

The record before us does not establish that Leifeste's adverse possession claim was groundless and made in bad faith. In her amended motion for sanctions, Estes argued the "groundless" nature of Leifeste's claim was established by the granting of summary judgment against Leifeste. However, earlier in this opinion, we concluded the trial court erred by granting summary judgment against Leifeste. We determined that the summary judgment evidence produced by Leifeste raised material fact issues concerning the challenged elements of his adverse possession claim and that Estes did not conclusively negate any element or otherwise establish that she was entitled to judgment as a matter of law. Under these circumstances, the trial court did not err by denying Estes's amended motion for sanctions.[9]

Furthermore, at this stage in the proceedings, Estes is not "the prevailing party" who "recover[ed] possession" of the disputed property "from a person unlawfully in actual possession" as required by the plain language of the statute. *See* TEX. CIV. PRAC. & REM. CODE § 16.034(a). Thus, Estes does not satisfy the requirements of either subsection 16.034(a)(1) or (a)(2). Accordingly, the trial court did not err by denying Estes's request for attorney's fees under either section 16.034(a)(1) or (a)(2). *See id.*

---

[8]Additionally, to recover attorney's fees under section 16.034(a), the person seeking possession is required to give a written demand for the person unlawfully in possession to vacate the premises at least ten days before filing the suit for recovery of possession. TEX. CIV. PRAC. & REM. CODE § 16.034(b),(c); *see Greak*, 481 S.W.3d at 335.

[9]On appeal, Estes does not challenge the trial court's denial of her motion for sanctions under chapter 10 of the civil practice and remedies code. Therefore, we do not address this basis for sanctions. *See* TEX. R. APP. P. 47.1 (providing that opinions must address "every issue raised and necessary to final disposition of the appeal.").

Finally, in her first issue, Estes argues the trial court abused its discretion by excluding evidence supporting her request for attorney's fees based on her failure to comply with discovery requirements. Because we have already determined that Estes did not meet the legal prerequisites for attorney's fees under section 16.034(a), this issue is unnecessary to the final disposition of this appeal, and we do not address it. *See* TEX. R. APP. P. 47.1.

## CONCLUSION

We affirm the part of the judgment denying the motion for sanctions and attorney's fees and reverse the part of the judgment granting summary judgment. We remand this case to the trial court for proceedings consistent with our opinion.

Liza A. Rodriguez, Justice